# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF KIM JACKSON, et al., | CASE NO. 1:21-CV-0415 AWI EPG |
| Plaintiffs | |
| v. | ORDER ON DEFENDANTS' MOTIONS TO DISMISS |
| CITY OF MODESTO, et al., | |
| Defendants | (Doc. Nos. 9, 16) |

This case stems from a fatal encounter between decedent Kim Jackson ("Jackson") and members of the Modesto Police Department ("MPD"). Plaintiffs, who are Jackson's Estate ("the Estate") and family, bring claims under 42 U.S.C. § 1983 (for violations of the First, Fourth and Fourteenth Amendments based on excessive force, interference with familial relationships, and *Monell* liability), 29 U.S.C § 779 (the Rehabilitation Act ("RA")), 42 U.S.C. § 12101 et *seq.* (Title II of the Americans with Disabilities Act ("the ADA")), as well as state law claims for violations of the California Constitution, Cal. Civ. Code § 52.1 (the Bane Act), assault/battery, negligence, and Cal. Code Civ. P. § 377.60 (wrongful death). Currently before the Court are two Rule 12(b)(6) motions to dismiss filed by Defendants, one by Officer Joseph Lamantia ("Lamantia") and one by the City of Modesto ("the City"), the MPD,[1] Police Chief Galen Carroll ("Chief Carroll"), Officer Alex Bettis ("Bettis"), and Officer Michael Callahan ("Callahan").[2] For the reasons that follow, the motions will be granted in part and denied in part.

---

[1] The MPD is an agency or subunit of the City. Generally when a municipality is already named as a defendant, also naming an agency or subunit of that municipality is redundant. See Santor v. Howell, 2020 U.S. Dist. LEXIS 154306, *34 (E.D. Cal. Aug. 24, 2020); Abeytia v. Fresno Police Dept., 2009 U.S. Dist. LEXIS 49500, *24-*25 (E.D. Cal. June 12, 2009). For purposes of this motion, the Court will view the MPD as an arm of the City.

[2] Lamantia is represented by his own counsel. However, the arguments made by Lamantia in support of his motion are substantially similar to the arguments made by the other Defendants. Unless the Court notes otherwise, a reference to "Defendants' arguments" means an argument that is substantially raised by all Defendants in their two respective motions.

1

## RULE 12(b)(6) FRAMEWORK

2   Under Federal Rule of Civil Procedure 12(b)(6), a claim may be dismissed because of the

3   plaintiff's "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  In

4   reviewing a complaint under Rule 12(b)(6), all well-pleaded allegations of material fact are taken

5   as true and construed in the light most favorable to the non-moving party.  Kwan v. SanMedica,

6   Int'l, 854 F.3d 1088, 1096 (9th Cir. 2017).  However, complaints that offer no more than "labels

7   and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."

8   Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Johnson v. Federal Home Loan Mortg. Corp., 793

9   F.3d 1005, 1008 (9th Cir. 2015).  The Court is "not required to accept as true allegations that

10  contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or

11  allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable

12  inferences."  Seven Arts Filmed Entm't, Ltd. v. Content Media Corp. PLC, 733 F.3d 1251, 1254

13  (9th Cir. 2013).  To avoid a Rule 12(b)(6) dismissal, "a complaint must contain sufficient factual

14  matter, accepted as true, to state a claim to relief that is plausible on its face."  Iqbal, 556 U.S. at

15  678; Mollett, 795 F.3d at 1065.  "A claim has facial plausibility when the plaintiff pleads factual

16  content that allows the court to draw the reasonable inference that the defendant is liable for the

17  misconduct alleged."  Iqbal, 556 U.S. at 678; Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir.

18  2013). "Plausibility" means "more than a sheer possibility," but less than a probability, and facts

19  that are "merely consistent" with liability fall short of "plausibility."  Iqbal, 556 U.S. at 678;

20  Somers, 729 F.3d at 960.  If a motion to dismiss is granted, "[the] district court should grant leave

21  to amend even if no request to amend the pleading was made . . . ."  Ebner v. Fresh, Inc., 838 F.3d

22  958, 962 (9th Cir. 2016).  However, leave to amend need not be granted if amendment would be

23  futile or the plaintiff has failed to cure deficiencies despite repeated opportunities.  Garmon, 828

24  F.3d at 842.

25

26

## FACTUAL BACKGROUND

27  From the Complaint, in October 2016, Jackson was 52 years old and suffered from mental

28  health and substance abuse issues that substantially limited her ability to care for herself,

2

concentrate, think, and communicate.  She had an extensive record of law enforcement contacts with the MPD under Cal. Wel. & Inst. Code § 5150.

On October 8, 2016, at 1:48 a.m. Glenn Jackson ("Glenn"), Jackson's father, called 911 from his home to report that Jackson was intoxicated and vandalizing his residence, but that no weapons were involved.

At 2:04 a.m., Defendant Callahan and another police officer arrived and spoke with Glenn. Jackson was no longer present, but Glenn explained that Jackson had been drinking and had threatened suicide.  Glenn also explained that he did not want Jackson arrested, he just wanted her to leave the residence.  Callahan closed the case about thirty minutes later and left the residence.

At 3:04 a.m., Glenn called 911 and reported that Jackson had returned to his home and was armed with a knife.

At 3:09 a.m., Callahan and Defendants Bettis and Lamantia arrived at Glenn's home. Bettis observed Jackson in the driveway and that she appeared to be agitated and screaming.  The officers discussed that they had been to the residence on prior occasions relating to Jackson, and Callahan explained that he intended to take Jackson into custody through a Cal. Wel. & Inst. Code § 5150 ("§ 5150") mental health hold.  However, the officers did not develop a "game plan" about how to approach or detain Jackson or reasonably accommodate Jackson's "present disabilities." Callahan armed himself with a Taser, Lamantia armed himself with a pistol, and Bettis armed himself with a shotgun.  Bettis's shotgun had been loaded with a breaching round, a special type of ammunition used to penetrate door locks but not meant to be used against people.

The officers walked toward the residence with their weapons unholstered and displayed. This show of force by the officers exacerbated Jackson's mental illness and exacerbated her fear and anxiety that the officers intended to harm her.  Jackson approached the officers in the street, and she had multi-colored kitchen knives in her hands.  The officers "triangulated" Jackson's position, which exacerbated Jackson's mental illness and increased her fear and anxiety.  Jackson then walked toward Lamantia.

Lamantia and Callahan then discharged their weapons.  Lamantia's bullet struck Jackson in the chest from a distance of 11 or 12 feet, while Callahan's taser probe struck Jackson's left wrist

3

from a distance of 17 feet.  Jackson then dropped all of the knives that she had in her hand. Jackson turned away from the officers and began to stagger away.  Jackson posed no threat to the officers or to anyone else after she turned and began staggering away.

While Jackson was staggering away from the officers, Bettis discharged his shotgun twice from a distance of 22 feet.  One of the rounds may have been a less-lethal "bean bag" round, but the other round discharged was a breaching round.  The breaching round penetrated Jackson's rib, left kidney, left adrenal, aorta, intestines, and stomach before finally lodging into her liver.

Lamantia also fired a second bullet at Jackson as she was staggering away.  The bullet grazed Jackson's right forearm from a distance of 17 feet.  Bettis and Lamantia both discharged their second rounds at the same time.

Jackson then collapsed on the ground.  She was transported to a hospital where she was pronounced dead.

That night, Bettis informed City police personnel that he had "fucked up" because he believed that he had previously loaded his shotgun with less-lethal bean bag rounds prior to shooting Jackson, but the shotgun was also loaded with a lethal breaching round.  Bettis also stated that he was "out of position" when the officers confronted Jackson.

The officers were all wearing bodycams which were activated prior to the shooting of Jackson.  The video from Lamantia's bodycam demonstrates Jackson's positioning during the officer involved shooting.

On October 10, 2016, the officers were interviewed regarding the shooting of Jackson. Also on October 10, 2016, the City issued a public "news release" that described the shooting of Jackson as follows:

> Officers arrived and as they were walking up to the home, Jackson confronted them in the street, armed with multiple knives.  As officers were giving verbal commands for her to drop the knives, she advanced rapidly at them with knives raised above her head.  Officers utilized a taser, bean bags, and one officer used his duty weapon.  She was rushed to a local hospital where she succumbed to her injuries.

News reports from the Modesto Bee newspaper and the KCRA television station conveyed substantially similar information.  Both news outlets indicated that police were summoned by

4

1  Jackson's parents, police went to the house twice because Jackson was gone the first time, Jackson

2  was armed with knives, Jackson confronted the officers, the officers told Jackson to stop or drop

3  the knives, but Jackson advanced quickly or ran towards the officers, and the officers used a taser,

4  bean bags, and a firearm.  See Doc. No. 16-2.[3]

5      In April 2017, the MPD convened a "shooting review board" for the purposes of

6  evaluating the shooting of Jackson.  The board consisted of Chief Carroll, Assistant Police Chief

7  Armendariz, and three Captains.  The board unanimously concluded that the shooting was justified

8  and within policy.

9      The City and Chief Carroll did not make the bodycam footage available to Jackson's

10  family or the public.  Jackson's family relied on the City's October 10 press release, as well as a

11  July 2018 press release from the Stanislaus County District Attorney, to conclude that the officer

12  involved shooting was justified and that there was no legal basis to pursue legal action regarding

13  Jackson's death.  Plaintiffs allege that they had no reason to know that the officer-involved

14  shooting was not justified or that improper tactics and ammunition were utilized.  Upon

15  information and belief, the City, Carroll, Bettis, Callahan, and Lamantia actively and intentionally

16  concealed critical details of the officer-involved shooting which would have demonstrated that the

17  shooting was unreasonable.  Specifically, the following information was never publicly revealed:

18  (1) Bettis shot Jackson in the back with a breaching round; (2) Bettis admitted that he had "fucked

19  up" when he shot Jackson in the back with a breaching round; (3) Bettis admitted that he was out

20  of position prior to shooting Jackson; and (4) the officers did not discuss a game plan for

21  approaching and detaining Jackson.  It was not until November 2020 that Plaintiffs obtained

22  access to the Shooting Review Board report and learned for the first time the unreasonable nature

23  of the shooting and the improper customs and practices of the City that were at work.

24      On January 21, 2021, Plaintiffs submitted a government claim to the City regarding the

25  officer involved shooting of Jackson.  By March 8, 2021, the claim was deemed rejected.

26

27  [3] Lamantia requests that the Court take judicial notice of the two news stories.  See Doc. No. 16-2.  Plaintiffs object.
   However, the Ninth Circuit has held that courts may take judicial notice of publications in order to demonstrate what
   was in the public realm at a relevant time.  Von Saher v. Norton Museum of Art at Pasadena, 592 F.3d 954, 960 (9th

28  Cir. 2010).  The Court will overrule Plaintiffs' objection and grant judicial notice of the news articles, but only for the
   limited purpose of demonstrating what information was in the public realm as of October 2016.  See id.

On January 25, 2021, Plaintiffs submitted a citizen complaint to the MPD regarding the officer involved shooting of Jackson.  The next day, the MPD responded by stating that the "complaint has already been investigated under Internal Affairs case number FD16-006.  This investigation was found to be "Within Policy."  The "Within Policy" response was not one of the five responses mandated by the MPD's Citizen Complaint Policy.  Further, Internal Affairs case number FD16-006 did not investigate the allegations of misconduct by the three officers and concluded only that the officers' use of force was "justified and within policy."

Plaintiffs allege that the MPD has two general unconstitutional policies.  First, the MPD failed to have policies that were consistent with POST Learning Domain 37, regarding People with Disabilities.  The MPD's general use of force policy did not provide guidance or training concerning how officers should handle mentally unstable individuals in connection with a use of force.  The MPD never implemented policies or training regarding detaining and arresting individuals that have disabilities or are taking substances that impair their ability to understand and respond to the police.  Second, the MPD has a policy or custom of tolerating excessive force.  This policy is reflected in the conduct of the three officers in their use of force against Jackson, as well as a description of 22 incidents spanning February 2009 to December 2020 in which MPD officers allegedly engaged in excessive force.

**DEFENDANTS' MOTIONS**

**I.** **Federal Claims – First, Second, Third, Fourth, & Fifth Causes of Action**

*Defendants' Arguments*

Defendants argue that Plaintiffs' claims are barred by the statute of limitations.  The Complaint shows that all claims accrued on October 8, 2016, which is the date that Plaintiffs knew or should have known of Jackson's injuries when she was shot by police officers outside of her parents' home.  The applicable statute of limitations for the various claims range from one to three years.  However, the Complaint was not filed until March 2021. Therefore all claims are untimely on the face of the Complaint.  Defendants also argue that equitable tolling and equitable estoppel do not apply.  There are no allegations that Plaintiffs took any actions to determine Jackson's

1   cause of death.  Further, there are no allegations that the officers' identities were withheld or that

2   any officers of City personnel stonewalled or made improper or false statements to Plaintiffs.

3        Defendants also argue that the claims against Chief Carroll are not plausible.  There are no

4   allegations that he personally participated in the shooting of Jackson or that he has a sufficient

5   causal connection to the shooting.  The allegations that are made against him are conclusory and

6   boilerplate that do not cross the plausibility threshold.

7        Defendants also argue that Plaintiffs' RA and ADA claims fail because Plaintiffs have

8   failed to properly allege that Jackson has a "disability" for purposes of those laws.  The Complaint

9   merely uses the definitions and language of those acts in conclusory fashion.  The allegations

10   make it equally plausible that Jackson had substance abuse problems that do not fit the definition

11   of a "disability."

12        Finally, Lamantia argues that Plaintiffs do not plead with the particularity the elements

13   necessary to establish equitable estoppel.  Lamantia argues that two news stories that appeared in

14   the Modesto Bee and on the KCRA news broadcast on October 10, 2016, and a July 9, 2018 press

15   release by the Stanislaus County District Attorney's Office describe critical details that would put

16   a reasonable plaintiff on inquiry notice.  For examples, the news stories indicate that Jackson was

17   armed with multiple knives, she confronted the three identified officers, she was told to drop the

18   knives and back up, she started running towards the officers with knives raised, and was killed

19   when the officers utilized a taser, bean bag rounds, and a firearm.  Further, Lamantia argues that

20   there are no allegations of affirmative misconduct by any Defendant, particularly him, that would

21   support equitable tolling.  The Complaint merely identifies the passive non-disclosure of

22   information, even though no duty to disclose the information is identified.

23        *Plaintiffs' Opposition*

24        Plaintiffs argue that their claims are timely.  Various law enforcement agencies released

25   public statements stating that the officer-involved shooting of Jackson was justified less than two

26   years after the incident.  Specifically, the MPD released a press release that falsely represented

27   that Bettis used a bean bag round when he in fact used a lethal breaching round.  The Complaint

28   alleges that Plaintiffs relied on these public statements to conclude that the shooting of Jackson

was justified.  The Complaint explains that it was not until November 2020 that they learned of the details of the officer involved shooting after obtaining access to the findings of the Shooting Review Board.  It was then that Plaintiffs learned that Bettis shot Jackson in the back with a breaching round, not a bean bag round; that Bettis admitted that "fucked up" by shooting Jackson with breaching round; that Bettis admitted that was out of position prior to shooting; and the officers had no game plan for approaching and detaining Jackson.  Thus, while Plaintiffs state that they knew Jackson was killed, they did not know or have reason to know of the cause of the injury until they obtained materials identifying critical information that demonstrated that the shooting was not justified.

Plaintiffs also argue that equitable tolling applies.  Plaintiffs argue that equitable tolling applies when the plaintiff is prevented from asserting a claim by wrongful conduct by a defendant or when extraordinary circumstances beyond the Plaintiffs' control make it impossible to file a claim.  In this case, the Complaint identifies the public statements of the MPD, alleges that Plaintiffs lacked access to the bodycam footage, and that the Defendants actively and intentionally concealed critical details of the shooting that would have demonstrated an unjustified use of force.  This is sufficient for equitable tolling.

Plaintiffs also argue that equitable estoppel applies.  The Complaint alleges that Defendants knew of the true facts through either their participation in the shooting or the bodycam footage at the time the MPD issued its misleading press release on October 10, 2016.  The Complaint also alleges that Defendants actively withheld critical details of the shooting as well as the bodycam footage.  The Complaint alleges that the Plaintiffs were ignorant of the true facts until November 2020, and had relied on the public statements of the Defendants to conclude that there was no basis for a legal action.  The Ninth Circuit has found claims timely in similar cases.  Although Defendants are critical of Plaintiffs conduct, they cite no authority that would require Plaintiffs to disbelieve the public statements of the MPD.  Given the public press releases, there was no apparent reason to do further investigation.

Plaintiffs further argue that Defendants' accrual analysis regarding *Monell* and supervisory liability claims is mistaken.  Courts have recognized that a cause of action against a municipality

accrues only when it is clear or should be clear that the harmful act is the consequence of a municipal policy or custom. As alleged above, it was not until November 2020 when the Shooting Review Board report was obtained that Plaintiffs knew or had reason to know of *Monell* and supervisory liability claims.[4]

With respect to the supervisory liability claims against Chief Carroll, Plaintiffs contend that it is not necessary to show that he directly participated in the shooting of Jackson. Instead, Plaintiffs argue that the Complaint has identified three bases for Chief Carroll's liability – failing to implement sufficient policies, maintaining a custom of tolerating excessive force, and ratification. The Complaint explains how there are an absence of policies regarding interactions with mentally disabled people or those suffering from substance abuse problems that affect their perception. The Complaint lists numerous instance of excessive force and notes that Chief Carroll has never found an officer involved shooting to not be within policy. Finally, the Complaint explains that Chief Carroll convened and sat on a Shooting Review Board that determined that the shooting of Jackson was justified and within policy.

Finally, with respect to the ADA and RA claims, Plaintiffs argue that they have alleged plausible claims. The Complaint identified major life activities of Jackson that were substantially limited. The Complaint further explains that Jackson had been suffering from mental health problems for years. Moreover, as long as the allegations and Plaintiffs' theory are plausible, that other theories, e.g. Jackson was suffering from the temporary effects of intoxication as opposed to a mental disability, are also plausible does not mean that dismissal is appropriate.

*Discussion*

1.     Statute of Limitations

If a federal statutory cause of action does not expressly supply a statute of limitations, courts generally borrow the most closely analogous limitations period from the forum state. Graham Cnty. Soil & Water Conservation Dist. v. United States, 545 U.S. 409, 414 (2005);

---

[4] Although not alleged in the Complaint, Plaintiffs' Opposition indicates that they became aware of the Shooting Review Board through filings in another case pending in the Eastern District of California – *Perkins v. City of Modesto*, 1:19-cv-0126 NONE EPG.

1  DirecTV, Inc. v. Webb, 545 F.3d 837, 847 (9th Cir. 2008); Lukovsky v. City & Cnty. of San

2  Francisco, 535 F.3d 1044, 1048 (9th Cir. 2008).  Federal courts also borrow tolling and equitable

3  related exceptions from the forum state to the extent those tolling doctrines and equitable

4  exceptions are not inconsistent with federal law.   Mills v. City of Covina, 921 F.3d 1161, 1166

5  (9th Cir. 2019); Emrich v. Touche Ross & Co., 846 F.2d 1190, 1199 (9th Cir. 1988).  However,

6  while state law sets the limitations period for a § 1983 action, federal law determines when a §

7  1983 claim accrues.  Bird v. Department of Human Services, 935 F.3d 738, 743 (9th Cir. 2019);

8  Gregg v. Department of Pub. Safety, 870 F.3d 883, 887 (9th Cir. 2017).  A claim accrues when the

9  plaintiff knows or has reason to know of the injury that is the basis of the action and the cause of

10 that injury.  Gregg, 870 F.3d at 887; Bonneau v. Centennial Sch. Dist. No. 28J, 666 F.3d 577, 581

11 (9th Cir. 2012).  An "injury" for purposes of accrual refers to an actual injury, not a legal wrong.

12 Lukovsky, 535 F.3d at 1051; see also Scheer v. Kelly, 817 F.3d 1183, 1189 (9th Cir. 2016).  A

13 plaintiff must be diligent in discovering the critical facts of his case.  Gregg, 870 F.3d at 887;

14 Klein v. City of Beverly Hills, 865 F.3d 1276, 1278 (9th Cir. 2017); see also Bonneau, 666 F.3d at

15 581.  Accrual occurs even if the full extent of the injury is unknown.  Gregg, 870 F.3d at 887.

16 Further, even if a plaintiff does not diligently investigate, equity will impute to the plaintiff

17 knowledge of the facts that would have been revealed by a reasonable investigation.  Oracle Am.,

18 Inc. v. Hewlett Packard Enter. Co., 971 F.3d 1042, 1047-48 (9th Cir. 2020).  The question of when

19 a claim accrues can often be a fact intensive inquiry.  G&G Prods. LLC v. Rusic, 902 F.3d 940,

20 953 (9th Cir. 2018).

21     A claim may be dismissed under Rule 12(b)(6) as barred by the statute of limitations if the

22 running of the statute is apparent on the face of the complaint and it is beyond doubt that the

23 plaintiff can prove no set of facts that would establish the timeliness of the claim.   United States ex

24 rel. Air Control Techs. v. Pre Con Indus., 720 F.3d 1174, 1178 (9th Cir. 2013); Von Saher v.

25 Norton Simon Museum of Art at Pasadena, 592 F.3d 954, 969 (9th Cir. 2010).  A plaintiff whose

26 complaint is susceptible to dismissal on limitations grounds has the burden of alleging facts that

27 demonstrate that his claims are in fact timely.  See Wasco Prods. v. Southwall Techs., Inc., 435

28 F.3d 989, 991 (9th Cir. 2006); Smith v. Duncan, 297 F.3d 809, 814 (9th Cir. 2001); Hinton v.

1  Pacific Enters., 5 F.3d 391, 395 (9th Cir. 1993)  The doctrines of equitable tolling and equitable

2  estoppel (sometimes called "fraudulent concealment"), which usually turn on factual

3  determinations, may extend the time for filing under the statute of limitations.  Pesnell v.

4  Arsenault, 543 F.3d 1038, 1042 (9th Cir. 2008); Lukovsky, 535 F.3d at 1051.

5         In this case, Plaintiffs bring three § 1983 claims, one RA claim, and one ADA claim.

6  Neither § 1983, see Bird, 935 F.3d at 743, the RA, Ervine v. Desert View Reg'l Med. Ctr.

7  Holdings, LLC, 753 F.3d 862, 869 (9th Cir. 2014), nor Title II of the ADA, see Sharkey v.

8  O'Neal, 778 F.3d 767, 770 (9th Cir. 2015), contain express statutes of limitations and thus, courts

9  borrow state law limitations periods for such claims.  For the § 1983 claims, the two year

10  limitations period of Cal. Code Civ. P. § 335.1 applies.  See Wheeler v. City of Santa Clara, 894

11  F.3d 1046, 1059 (9th Cir. 2018).  For the ADA claim, the three year limitations period of Cal.

12  Code Civ. P. § 338(a) applies.  See Sharkey, 778 F.3d at 771.  The Ninth Circuit has applied both

13  § 335.1 and § 338(a) to RA claims based on the arguments of the parties before them, but without

14  definitively deciding which statute applies.  E.g. Estate of Stern v. Tuscan Retreat, Inc., 725 F.

15  App'x 518, 521 (9th Cir. 2018); Pickern v. Holiday Quality Foods, 293 F.3d 1133, 1137 n.2 (9th

16  Cir. 2002).  Therefore, either a two or three year limitations period applies.  West v. Palo Alto

17  Hous. Corp., 2019 U.S. Dist. LEXIS 103665, *43 (N.D. Cal. June 20, 2019).  Because the result of

18  this motion will not change, the Court will follow the Ninth Circuit's lead and assume without

19  deciding that the § 338(a) three year limitations period applies to Plaintiffs' RA claim.  See Estate

20  of Stern, 725 F. App'x at 521.  With the understanding that a two year limitations period applies to

21  the § 1983 claims and a three year limitations period applies to the RA and ADA claims, the

22  question becomes when these claims accrued.

23                a.    Accrual

24                      (1)    Individual Officers

25                            (a)    Fourth Amendment – Excessive Force

26         Fourth Amendment rights are considered "personal" and may not be vicariously asserted.

27  Jones v. Las Vegas Metro. Police Dept., 873 F.3d 1123, 1128 (9th Cir. 2017).  However, pursuant

28  to 42 U.S.C. § 1988(a), a claim under § 1983 survives a decedent if the claim accrued before the

1   decedent's death, and if state law authorizes a survival action. George v. Morris, 736 F.3d 829,

2   833 n.6 (9th Cir. 2013); Tatum v. City & Cnty. of San Francisco, 441 F.3d 1090, 1093 n.2 (9th

3   Cir. 2006). California law authorizes survival actions. Chaudhry v. City of L.A., 751 F.3d 1096,

4   1103 (9th Cir. 2014); Smith v. City of Fontana, 818 F.2d 1411, 1416-17 (9th Cir. 1987).

5        Courts recognize that excessive force claims generally accrue on the date that excessive

6   force is used against an individual. See Soto v. Unknown Sweetman, 882 F.3d 865, 871 (9th Cir.

7   2018) (recognizing that excessive force claim accrued on the date that force was used); Cabrera v.

8   City of Huntington Park, 159 F.3d 374, 381 (9th Cir. 1998) (same); Crumpton v. Gates, 947 F.2d

9   1418, 1422 (9th Cir. 1991) (same). Force was used against Jackson on October 8, 2016 when the

10  officers shot and killed her. Moreover, this is not a situation in which it was unclear whether or by

11  whom force was used. Jackson's parents called the MPD twice on October 8, MPD officers used

12  force and killed Jackson on October 8 while at the property of Jackson's parents, and the City

13  acknowledged through a published press release on October 10, 2016, that MPD members used

14  force against Jackson that resulted in her death. Therefore, the Fourth Amendment excessive force

15  claim accrued on October 8, 2016. See id.

16       Plaintiffs argue that while they experienced an injury when Jackson was killed, they did

17  not know or have reason to know that the officers' use of force was not justified or that improper

18  tactics and ammunition had been employed. In other words, Plaintiffs contend that they did not

19  know that constitutionally excessive force was involved at the time Jackson was shot. It was not

20  until November 2020 that they learned that the officers' use of force was not justified and

21  unconstitutional. The Court cannot agree with Plaintiffs.

22       First, Plaintiffs' argument is foreclosed by *Lukovsky*. *Lukovsky* adopted the rule that a

23  claim accrues upon awareness of an actual injury, not when the plaintiff suspects a "legal wrong."

24  Lukovsky, 535 F.3d at 1049-51;[5] see also Whiting v. City of Cathedral City, 735 F. App'x 927,

25  928 (9th Cir. 2018); Zamorano v. City of San Jacinto, 585 F. App'x 397, 397-98 (9th Cir. 2014).

26  Plaintiffs' briefing admits that an actual injury was sustained on October 8 when the officers used

27

28  [5] The Court notes that while *Lukovsky* was an employment related case that relied in part on § 1983, the Ninth Circuit has indicated that its "actual injury" rule of accrual applies equally to all cases brought under *inter alia* § 1983 and is not limited to an employment context. Zamorano v. City of San Jacinto, 585 F. App'x 397, 397-98 (9th Cir. 2014).

1  force against Jackson.  That admission is sufficient for setting the date of accrual.  The additional

2  evidence discovered by Plaintiffs in November 2020 supports the theory that the legal wrong of

3  excessive force was committed, it does not change the actual injury that was suffered by Jackson

4  on October 8.  Cf. Rotella v. Wood, 528 U.S. 549, 555 (2000) (". . . discovery of the injury, not

5  discovery of the other elements of a claim, is what starts the [statute of limitations] clock.").

6  Therefore, accrual did not begin in November 2020 when Plaintiffs became aware of the legal

7  injury of excessive force.  See Whiting, 735 F. App'x at 928; Zamorano, 585 F. App'x at 397-98;

8  Lukovsky, 535 F.3d at 1049-51.

9       Second, survival actions are causes of action that existed and belonged to the decedent

10  while the decedent was alive, but survive the decedent's death.  Adams v. Superior Ct., 196

11  Cal.App.4th 71, 78 (2011); Quiroz v. Seventh Ave. Center, 140 Cal.App.4th 1256, 1264 (2006).

12  The Fourth Amendment claim is a survival action that belongs to Jackson's estate.  Tatum, 441

13  F.3d at 1093 n.2; Ruiz v. Podolsky, 50 Cal.4th 838, 850 n.3 (2010); Quiroz, 140 Cal.App.4th at

14  1264.  It is asserted on behalf of the decedent.  Estate of Elkins v. Pelayo, 2020 U.S. Dist. LEXIS

15  89857, *19-*21 (E.D. Cal. May 21, 2020); Brenner v. Universal Health Servs. of Rancho Springs,

16  Inc., 12 Cal.App.5th 589, 605 & n.9 (2017); Dominguez v. City of Alhambra, 118 Cal.App.3d

17  237, 243 (1981); see also Ruiz, 50 Cal.4th at 850 n.3.  The Ninth Circuit has indicated that a

18  § 1983 survival claim is one that accrued prior to a decedent's death.  See 42 U.S.C. § 1988(a);

19  George, 736 F.3d at 833 n.6; Tatum, 441 F.3d at 1093 n.2; Smith, 818 F.2d at 1416.  Therefore,

20  the focus of a survival claim for purposes of accrual is generally on what the decedent knew or

21  should have known.  See Lawson v. Okmulgee County Criminal Justice Authority, 726 F. App'x

22  685, 691 (10th Cir. 2018); Miller v. Philadelphia Geriatric Ctr., 463 F.3d 266, 276 (3d Cir. 2006);

23  Garrett v. Corizon, LLC, 2019 U.S. Dist. LEXIS 88741, *6-*7 (M.D. Ala. May 28, 2019);

24  Lockhart-Mollah v. Gov't of the V.I., 2009 U.S. Dist. LEXIS 67541, *11-*12 (D.V.I. July 31,

25  2009).  California law does not appear to be contrary.  The relevant survival related statutes

26  discuss a decedent's cause of action and the limitations period that would have applied if the

27  decedent had not died.  That is, the statutes' focus is the decedent, they do not discuss a different

28  limitations period applicable to the estate (with a possible limited six-month exception).  See Cal.

1   Code Civ. P. § 366.1 ("If a person entitled to bring an action dies before the expiration of the

2   applicable limitations period, and the cause of action survives, an action may be commenced

3   before the expiration of the later of the following times: (a) Six months after the person's death.

4   (b) The limitations period that would have been applicable if that person had not died."); Cal.

5   Code Civ. P. § 377.20(a) ("[A] cause of action for . . . a person is not lost by reason of the

6   person's death, but survives subject to the applicable limitations period."); see also Brenner, 12

7   Cal.App.5th 605 & n.9; Dominguez, 118 Cal.App.3d at 243.  Further, as stated above, California

8   courts recognize that the claim existed prior to the decedent's death.  See Adams, 196 Cal.App.4th

9   at 78; Quiroz, 140 Cal.App.4th at 1264.  For a claim to belong to the decedent prior to death

10  indicates that accrual could not post-date death.  Indeed, "[n]o civil claim can be asserted, on a

11  decedent's personal behalf, for injury or damage to the decedent that occurs, or accrues, after the

12  decedent has died."  People v. Runyan, 54 Cal.4th 849, 861-62 (2012).

13         From the allegations in the Complaint, Jackson would have been aware that she was

14  running away from the officers, did not pose a threat to them, and was shot multiple times with

15  multiple projectiles despite not being a threat to the officers.  Therefore, because Jackson was

16  aware of her injuries, that three officers of the City inflicted the injuries, and many of the facts that

17  were unknown to the Plaintiffs/representative of the Estate, the fact that the representative of

18  Estate actually learned of additional evidence in November 2020 is not relevant for purposes of

19  federal accrual.  There is nothing to suggest that the general rule for accrual of an excessive force

20  case does not apply.  See Soto, 882 F.3d at 871; Cabrera, 159 F.3d at 381; Crumpton, 947 F.2d at

21  1422.

22                          (b)     First and Fourteenth Amendment - Familial Relations

23         The First and Fourteenth Amendments protect against *inter alia* improper and

24  unwarranted interference with the familial relationship between parents and children.  Keates v.

25  Kolie, 883 F.3d 1228, 1235-36 (9th Cir. 2018); Lee v. City of L.A., 250 F.3d 668, 687 (9th Cir.

26  2001).  When separations are involved, a mere investigation or threat of interference is not

27  actionable, rather there must be an actual loss of control of the familial relationship.  Dees v.

28  County of San Diego, 960 F.3d 1145, 1153 (9th Cir. 2020).

In this case, any interference with the familial relations occurred at the moment that the defendant officers shot and killed Jackson. It was at that time, and no other time, that Jackson's parents and children lost their relationship with her because the relationship was permanently extinguished. See Crumpton, 947 F.2d at 1422 (finding that action that interfered with an unborn plaintiff's right to familial association was the killing of the plaintiff's father by law enforcement); cf. Capp v. County of San Diego, 940 F.3d 1046, 1060 (9th Cir. 2019) (finding no interference were plaintiff was investigated but never lost custody of children); Moore v. County of Sacramento, 2020 U.S. Dist. LEXIS 85324, *18 (E.D. Cal. May 14, 2020) (finding that the act of removing a child from the home was the act of interference for purposes of familial association claim). Further, Jackson was killed outside her parents' home after her parents requested assistance from the City police. In the absence of contrary allegations, it is more than reasonable to infer that Jackson's parents became aware of Jackson's death at the hands of City law enforcement the same day Jackson was killed, October 8. While it is unknown precisely when Jackson's children would have become aware of Jackson's death, it is likely that they also knew from their grandparents about MPD officers shooting Jackson on the same day she was killed. Therefore, in the absence of contrary allegations, the Complaint indicates that the familial relationship claims accrued on October 8, 2016, because that is the date that Plaintiffs likely knew that their relationship with Jackson was extinguished by the City police officers.

(2) The City

(a) First Cause of Action -- § 1983 Excessive Force

Municipalities are considered "persons" under 42 U.S.C. § 1983 and therefore may be liable for causing a constitutional deprivation. Monell v. Department of Soc. Servs., 436 U.S. 658, 690 (1978); Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006). A municipality, however, "cannot be held liable solely because it employs a tortfeasor or, in other words, a municipality cannot be held liable under [42 U.S.C. § 1983] under a *respondeat superior* theory." Monell, 436 U.S. at 691; Benavidez v. County of San Diego, 993 F.3d 1134, 1153 (9th Cir. 2021). Liability only attaches where the municipality itself causes the constitutional violation through "execution of a government's policy or custom, whether made by its lawmakers or by

1   those whose edicts or acts may fairly be said to represent official policy." Monell, 436 U.S. at

2   694; Ulrich v. City & County of San Francisco, 308 F.3d 968, 984 (9th Cir. 2002); see Pasadena

3   Republican Club v. Western Justice Ctr., 985 F.3d 1161, 1171-72 (9th Cir. 2021).  Municipal

4   liability may be premised on: (1) conduct pursuant to an expressly adopted official policy; (2) a

5   longstanding practice or custom which constitutes the "standard operating procedure" of the local

6   government entity; (3) a decision of a decision-making official who was, as a matter of state law, a

7   final policymaking authority whose edicts or acts may fairly be said to represent official policy in

8   the area of decision; or (4) an official with final policymaking authority either delegating that

9   authority to, or ratifying the decision of, a subordinate.  See Price v. Sery, 513 F.3d 962, 966 (9th

10  Cir. Or. 2008); Lytle v. Carl, 382 F.3d 978, 982 (9th Cir. 2004); Ulrich, 308 F.3d at 984-85;

11  Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1995).

12      The Ninth Circuit has not expressly held when a *Monell* claim accrues – upon incurring the

13  injury or upon discovery (actual or constructive) that an official policy or custom caused the

14  injury.[6]  Marlowe v. City & Cnty. of San Francisco, 753 F. App'x 479, 479 (9th Cir. 2019).  The

15  Second Circuit has held that, "[s]ince an actionable claim under § 1983 against a county or

16  municipality depends on a harm stemming from the municipality's 'policy or custom,' a cause of

17  action against the municipality does not necessarily accrue upon the occurrence of a harmful act,

18  but only later when it is clear, or should be clear, that the harmful act is the consequence of a

19  county 'policy or custom.'" Pinaud v. County of Suffolk, 52 F.3d 1139, 1157 (2d Cir. 1995); see

20  Birch v. City of N.Y., 675 F. App'x 43, 45 (2d Cir. 2017).  Some courts have rejected *Pinaud*.

21  E.g. King-White v. Humble Indep. Sch. Dist., 803 F.3d 754, 763 (5th Cir. 2015); Rich v. Hershl,

22  2021 U.S. Dist. LEXIS 118098, *34-*35 (D. Md. June 24, 2021).  However, many courts within

23

24  ---
    [6] In *Lockett v. County of L.A.*, 977 F.3d 737 (9th Cir. 2020), the District Court denied a motion to dismiss in which the
    County had argued that a *Monell* claim was untimely because the plaintiff was beaten by police two years and five

25  months prior to filing suit.  The District Court held that Lockett was entitled to eight months of tolling under Cal. Civ.
    Code § 945.3 (prohibiting certain claims against a peace officer or employing entity while criminal charges against a

26  plaintiff are pending).  The Ninth Circuit accepted an interlocutory appeal on the issue of whether § 945.3 applies to
    *Monell* claims.  See id. at 740.  The Ninth Circuit held that § 945.3 tolling can apply to a *Monell* claim.  See id. at 743.

27  However, the Ninth Circuit did not expressly discuss accrual, and it does not appear that Lockett made any arguments
    that challenged the County's position that the *Monell* claim accrued on the date he was beaten.  See Lockett v. County

28  of L.A., 2019 U.S. Dist. LEXIS 123817, *5-*6 (C.D. Cal. May 29, 2019).

the Ninth Circuit have followed *Pinaud*. <u>See</u> <u>Moore v. County of Sacramento</u>, 2020 U.S. Dist. LEXIS 85324, *21-*22 (E.D. Cal. May 14, 2020); <u>O'Shea v. County of San Diego</u>, 2019 U.S. Dist. LEXIS 164600, *5 (S.D. Cal. Sept. 24, 2019); <u>Wilson v. Hays</u>, 228 F.Supp.3d 1100, 1111-12 (S.D. Cal. 2017); <u>Doe v. City of Eugene</u>, 2016 U.S. Dist. LEXIS 46967, *1 (D. Or. Apr. 6, 2016); <u>Bodnar v. Riverside Cnty. Sheriff's Dept.</u>, 2014 U.S. Dist. LEXIS 83110, *11 (C.D. Cal. Mar. 28, 2014); <u>King v. County of L.A.</u>, 2012 U.S. Dist. LEXIS 201079, *12 (C.D. Cal. July 31, 2012); <u>Matheny v. Clackamas Cnty.</u>, 2012 U.S. Dist. LEXIS 6661, *12-*13 (D. Or. Jan. 19, 2012); <u>Temple v. Adams</u>, 2006 U.S. Dist. LEXIS 97616, *31 (E.D. Cal. Aug. 23, 2006); <u>but see</u> <u>Caples v. City of Phoenix</u>, 2018 U.S. Dist. LEXIS 188429, *7-*9 (D. Ariz. June 28, 2018).

The reasoning of these cases, either implicit or explicit, is well reflected in *Wilson*. The reasoning is that a § 1983 claim accrues when a plaintiff knows or has reason to know of the injury that is the basis of the action and the cause of that injury. <u>Gregg</u>, 870 F.3d at 887; <u>Bonneau</u>, 666 F.3d at 581; <u>Wilson</u>, 228 F.Supp.3d at 1112. A *Monell* claim is based on an injury that was caused by a governmental policy, custom, or practice. <u>Pasadena Republican Club</u>, 985 F.3d at 1172; <u>Wilson</u>, 228 F.Supp.3d at 1112. "It follows that [a plaintiff's *Monell* claim accrues] when she knew or in the exercise of reasonable diligence should have known of not only her injury, but also the [government]'s alleged wrongful policies – the cause of her injury for her *Monell* claim." <u>Wilson</u>, 228 F.Supp.3d at 1112.

The City does not argue that *Pinaud* or *Wilson* were wrongly decided or that the Court should not follow this line of cases. In fact, the City accepts that *Wilson* is an accurate statement of the law (at least within the Ninth Circuit). <u>See</u> Doc. No. 19 at 8:18-21. *Wilson*'s analysis and *Pinaud*'s conclusion appear to be consistent with *Gregg* and *Bonneau*, as well as the Ninth Circuit's description of *Monell* liability, i.e. the municipality itself causes an injury through policies, customs, or practices. <u>Ulrich</u>, 308 F.3d at 984. In the absence of briefing to the contrary, the Court will follow *Pinaud* and *Wilson*. Therefore, the Estate's *Monell* claims accrued when Jackson was not only aware of her injuries, but also when she knew or should have known that her injuries were caused by the City's customs, policies, or practices. <u>Pinaud</u>, 52 F.3d at 1157; <u>Wilson</u>, 228 F.Supp.3d at 1112.

So applying this rule, the Court cannot determine when the § 1983 *Monell* claim accrued at this time.  Plaintiffs argue that the *Monell* claim accrued in November 2020 based on the information that they learned.  However, this is not the correct focus of an accrual analysis in the context of a survival cause of action.  As discussed above, survival claims are those that belonged to the decedent and accrued before death.  Therefore, the proper focus is on the decedent's, i.e. Jackson's, knowledge or investigation.  What Plaintiffs may have known or learned does not address accrual of Jackson's claim.  On the other hand, the City agrees with the law as stated by *Wilson* (and thus, *Pinaud*), but fails to explain why Jackson either would or would not have knowledge that the City's policies or customs were a cause of her injuries.  Merely stating that the claim accrued on October 8, 2016 without adequate explanation of Jackson's knowledge or citation to relevant authority does not establish a proper accrual date.

The Court can only dismiss a claim based on the expiration of the statute of limitations if the face of the complaint shows that the claim is untimely.  See Air Control, 720 F.3d at 1178; Von Saher, 592 F.3d at 969.  The question of accrual in this case is a highly factual one.  See G&G Prods., 902 F.3d at 953.  Without an accrual date, the Court cannot determine if the two year limitations period has run.  Therefore, because the Court cannot hold at this time that the face of the Complaint shows that the Estate's *Monell* claims accrued more than two years from the filing of the Complaint, dismissal of the *Monell* claims is inappropriate.  See Air Control, 720 F.3d at 1178; Von Saher, 592 F.3d at 969.

(b)      Rehabilitation & ADA Claims

While Title II of the ADA applies only to public entities and § 794 of the RA applies to entities who receive federal funds, both prohibit discrimination on the basis of disability in the provision of or participation in certain programs and services.  See 29 U.S.C. § 794; 42 U.S.C. § 12132; Lovell v. Chandler, 303 F.3d 1039, 1052 (9th Cir. 2002).  Both of these provisions include an affirmative obligation for public entities to make benefits, services, and programs accessible to people with disabilities.  Updike v. Multnomah Cty., 870 F.3d 939, 949 (9th Cir. 2017).  Title II of the ADA was expressly modeled after § 794 of the RA.  Duvall v. County of Kitsap, 260 F.3d 1124, 1135 (9th Cir. 2002).  Title II essentially extends the anti-discrimination prohibition

embodied in § 794 to all actions of state and local government.  Barden v. City of Sacramento, 292 F.3d 1073, 1077 (9th Cir. 2002).  Therefore, there is no significant difference in the analysis of rights and obligations created by the two statutes, City of L.A. v. AECOM Servs., 854 F.3d 1149, 1160 (9th Cir. 2017), and cases interpreting either statute are applicable and interchangeable. Douglas v. California Dept. of Youth Auth., 285 F.3d 1226, 1229 n.3 (9th Cir. 2002).  To establish a violation of Title II of the ADA, a plaintiff must show:  "(1) he is a 'qualified individual with a disability'; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability."  Updike, 870 F.3d at 949; Duvall, 260 F.3d at 1135.  An RA plaintiff must establish essentially the same elements, except he must also demonstrate that the program providing the benefit or services receives federal financial assistance.[7]  See Updike, 870 F.3d at 949; Lovell, 303 F.3d at 1052.  Title II of the ADA and the RA apply to arrests.  See Dunlap v. City of Sandy, 846 F. App'x 511, 513 (9th Cir. 2021); City & Cnty of San Francisco v. Sheehan, 743 F.3d 1211, 1232 (9th Cir. 2014).[8]  As relevant here, Title II and the RA can be violated when, although the police properly investigate and arrest a person with a disability for a crime unrelated to that disability, the police fail to reasonably accommodate the person's disability in the course of investigation or arrest, causing the disabled person greater injury or indignity in that process than other arrestees. Sheehan, 743 F.3d at 1232.  Additionally, the Ninth Circuit has held that, through application of federal common law, a decedent's ADA and RA compensatory damages claim do not abate at the time of the decedent's death (although punitive damages claims do abate) and may be pursued by a relative or the estate of the decedent.  Wheeler v. City of Santa Clara, 894 F.3d 1046, 1056-57 (9th Cir. 2018).

    In this case, the ADA and RA claims are survival claims brought by the Estate that survived Jackson's death.  The Complaint alleges that the defendant officers failed to

---

[7] The four elements of an RA claim identified by the Ninth Circuit are:  (1) the plaintiff is an individual with a disability; (2) he is otherwise qualified to receive the benefit; (3) he was denied the benefits of the program solely by reason of his disability; and (4) the program receives federal financial assistance.  Updike, 870 F.3d at 949.

[8] Reversed on other grounds, 575 U.S. 600 (2015).

accommodate Jackson's disability by failing to approach, speak, and interact with Jackson in a non-confrontational manner that did not threaten force.  See Complaint at ¶¶ 115, 121.  The Complaint also alleges that the City maintained policies or customs of action and inaction that harmed Jackson.  See id. at ¶¶ 116, 122.  Plaintiffs contend that these allegations support liability against the City for the City's own policies and vicarious liability for the actions of its officers.

<u>(i)</u>      <u>Vicarious Liability</u>

Under the RA and Title II of the ADA, a public entity may be held vicariously liable for the acts of its employees.  <u>United States v. Town of Colorado City</u>, 935 F.3d 804, 809 (9th Cir. 2019); <u>Duvall</u>, 260 F.3d at 1141.

The harm at issue in the RA and ADA claims is the failure of the officers to give a reasonable accommodation to Jackson.  The failure to give a reasonable accommodation is a form of disability discrimination.  <u>See Updike</u>, 870 F.3d at 951; <u>A.G. v. Paradise Valley Unified Sch. Dist. No. 69</u>, 815 F.3d 1195, 1206 (9th Cir. 2016).  An RA and ADA claim generally accrues upon the occurrence of a distinct discriminatory act.  <u>See Ervine</u>, 753 F.3d at 869-70 (explaining *inter alia* that "[s]o long as an alleged violation of [the RA] is a discrete act and independently wrongful discriminatory act, it causes a new claim to accrue and a new limitations period to run.").

The positions of the parties on the issue of accrual are essentially identical to those taken with respect to the § 1983 claims.  The Court finds for largely identical reasons that the ADA and RA vicarious liability claims accrued on October 8, 2016.  The discriminatory acts/failure to accommodate by the officers occurred on October 8, 2016.  Moreover, Jackson would have known of the officers' actions and known that they did not honor any requested accommodations or render any reasonably obvious accommodations during the incident.  Further, while Jackson's estate or the estate's representative may have learned additional evidence in November 2020, the additional evidence merely augmented the probability of a legal wrong/injury; the actual injury, i.e. the failure to accommodate, had already occurred on October 8, 2016.  Therefore, the RA and ADA claims for vicariously liability accrued on October 8, 2016.

<u>(ii)</u>      <u>Policy, Practice or Custom</u>

Plaintiffs contend that the City may be held directly liable under the ADA and the RA

20

through essentially *Monell* policy, custom, or practice theories.  Plaintiffs correctly cite cases that have recognized a failure to train theory of ADA and RA liability.  However, Plaintiffs cite no cases in which non-failure to train policy or practice theories have been applied in the ADA and RA context.  The Court is aware of one case in which policy, practice, and custom allegations were stricken from an ADA claim as immaterial.  See Banuelos v. City of San Bernardino, 2016 U.S. Dist. LEXIS 202028, *5-*6 (C.D. Cal. Dec. 1, 2016).  Further, a failure to train theory under the ADA and the RA does not appear to be universally accepted.  See J.V. ex rel. C.V. v. Albuquerque Pub. Sch., 813 F.3d 1289, 121297 & n.4 (10th Cir. 2016) (declining to determine whether such a claim exists and noting the status of failure to train claims in other jurisdictions).  Nevertheless, a number of district court cases within the Ninth Circuit have accepted a failure to train theory.  Moreover, in *O'Doan v. Sanford*, 991 F.3d 1027, 1038 n.1 (9th Cir. 2021), the Ninth Circuit held that summary judgment on an ADA failure to train claim was appropriately granted because the evidence did not show that different training would have changed the result of the confrontation in that case.  The Ninth Circuit did not hold that a failure to train theory is not cognizable under the ADA.[9]  Given *O'Doan* and the district court cases within the Ninth Circuit, and in the absence of on point authority that supports Plaintiffs' broader characterization of their claims, the Court will read the Complaint as alleging direct liability of the RA and Title II of the ADA based only on a failure to train.

For a failure to train claim under Title II of the ADA and the RA, Court's utilize the *Monell* framework for § 1983 claims.  See Bauer v. City of Pleasanton, 2021 U.S. Dist. LEXIS 103627, *53-*54 (C.D. Cal. June 2, 2021) (assuming that a failure to train claim is cognizable and granting summary judgment for the same reasons that a § 1983 *Monell* claim failed); O'Doan v. Sanford, 2019 U.S. Dist. LEXIS 52810, *6-*7 (D. Nev. Mar. 26, 2019); Lerma v. City of Nogales, 2014 U.S. Dist. LEXIS 139613, *49-*50 (D. Ariz. May 19, 2014); Green v. Tri-Country Metropolitan Transp. Dist. of Or., 909 F.Supp.2d 1211, 1220-21 (D. Or. 2012).  As a *Monell* related theory, the plaintiff must demonstrate *inter alia* that a municipality's failure to train caused

---

[9] However, *O'Doan* does not indicate whether the defendants actually challenged the validity of an ADA failure to train theory.

1  an injury.  See Tanner v. Heise, 879 F.2d 572, 582-83 (9th Cir. 1989); see also O'Doan, 991 F.3d

2  at 1038 n.1 (dismissing claim where additional training would not have changed the outcome of

3  the confrontation with the disabled plaintiff).

4      Because the *Monell* framework applies to the ADA and RA failure to train claim, the

5  Court's above § 1983 *Monell* accrual analysis applies.  The parties have not sufficiently

6  demonstrated or explained when Jackson knew or should have known that the City's failure to

7  train caused her injuries.  In other words, the Court cannot determine at this time when the RA and

8  ADA failure to train claims accrued.  Without an accrual date, the Court cannot determine when

9  the statute of limitations expired.  Thus, the RA and ADA failure to train claims cannot be

10  dismissed based on the expiration of the statute of limitations.  See Air Control, 720 F.3d at 1178;

11  Von Saher, 592 F.3d at 969.

12                    (3)    Chief Carroll

13      Supervisors may not be held vicariously liable under § 1983 for the constitutional

14  violations inflicted by their subordinates.  Lemire v. California Dept. of Corr. & Rehab., 726 F.3d

15  1062, 1074 (9th Cir. 2013); Hansen v. Black, 885 F.2d 642, 645-46 (9th Cir. 1989).  Rather, a

16  "supervisor may be liable under § 1983 only if there exists either (1) his or her personal

17  involvement in the constitutional deprivation, or (2) a sufficient causal connection between the

18  supervisor's wrongful conduct and the constitutional violation."  Keates , 883 F.3d at 1242-43;

19  Hansen, 885 F.2d at 646.  "The requisite causal connection may be established when an official

20  sets in motion a series of acts by others which the actor knows or reasonably should know would

21  cause others to inflict constitutional harms."  Vazquez v. County of Kern, 949 F.3d 1153, 1166

22  (9th Cir. 2020); Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).  As such, the Ninth Circuit

23  has recognized that a supervisor may be liable:  (1) for his own culpable action or inaction in the

24  training, supervision, or control of his subordinates; (2) for his acquiescence in the constitutional

25  deprivations of which the complaint is made; or (3) for conduct that showed a reckless or callous

26  indifference to the rights of others."  Keates, 883 F.3d at 1243; Lemire, 726 F.3d at 1074.  If a

27  subordinate's actions do not violate the Constitution, then the supervisor will not be liable.

28  Watkins v. City of Oakland, 145 F.3d 1087, 1093 (9th Cir. 1998).

The accrual analysis for Chief Carroll is similar to the accrual analysis for the City. Chief Carroll was not present at and did not participate in the shooting. The Complaint alleges liability based on ratification/acquiescence and improper training and supervision, i.e. no training regarding approaching and detaining the mentally disabled and tolerating a custom of excessive force. As with the *Monell* claim, the Court cannot determine at this time when the supervisory claims against Chief Carroll accrued. Plaintiffs focus on their own knowledge of facts without addressing Jackson's knowledge, and Chief Carroll does not explain how or why Jackson would have knowledge of improper supervision. Without an accrual date, the Court cannot determine when the statute of limitations expired. Therefore, the supervisory liability claims against Chief Carroll cannot be dismissed at this time based on the expiration of the statute of limitations. See Air Control, 720 F.3d at 1178; Von Saher, 592 F.3d at 969.

### b. Tolling and Estoppel

The federal claims at issue can generally be divided into two groups: claims premised on the conduct of individual officers and claims premised on the execution of a policy, practice, or custom. The Court has determined that the accrual date for the latter group of claims as well as the supervisory claims against Chief Carroll cannot be determined at this time and thus, the Court cannot hold that these claims are time-barred. However, the Court has determined that the former group of claims all accrued on October 8, 2016 and thus, appear to be time barred from the face of the Complaint. Plaintiffs contend that the doctrines of equitable tolling and equitable estoppel apply such that dismissal due to expiration of the statute of limitations is inappropriate. The Court will address the tolling and estoppel doctrines separately.

### (1) Equitable Tolling

When a California statute of limitations is borrowed, federal courts also borrow California's equitable tolling doctrine. Butler v. National Cmty. Renaissance of Cal., 766 F.3d 1191, 1204 (9th Cir. 2014). Under California law, equitable tolling developed from three strands of case law to allow courts "occasionally and in special situations" to exercise their inherent equitable powers to "soften the harsh impact of technical rules." Saint Francis Mem'l Hosp. v. State Dep't of Pub. Health, 9 Cal.5th 710, 724 (2020); Addison v. State of California, 21 Cal.3d

313, 316-17 (1978).  Equitable tolling "suspend[s] or extend[s] a statute of limitations as necessary to ensure fundamental practicality and fairness."  Saint Francis, 9 Cal.5th at 719; McDonald v. Antelope Valley Community College Dist., 45 Cal.4th 88, 99 (2008).  Equitable tolling today will apply when three "elements" are present: "(1) timely notice [to the defendant], (2) lack of prejudice to the defendant, and (3) reasonable and good faith conduct on the part of the plaintiff."  Saint Francis, 9 Cal.5th at 724; Addison, 21 Cal.3d at 319; see also Butler, 766 F.3d at 1204.  These requirements "balanc[e] … the injustice to the plaintiff occasioned by the bar of his claim against the effect upon the important public interest or policy expressed by the [operative] limitations statute."  Saint Francis, 9 Cal.5th at 724-25; Addison, 21 Cal.3d at 321.  The first element, "timely notice," is to be interpreted literally and courts must examine each case on its facts to determine whether the defendant received timely notice of the plaintiff's intent to file suit.  Saint Francis, 9 Cal.5th at 727.  For purposes of the second element, a defendant is prejudiced if application of equitable tolling would prevent the defendant from defending a claim on the merits.  Id. at 728; Addison, 21 Cal.3d at 318.  Lastly, the third element requires that a plaintiff's conduct be objectively reasonable and subjectively in good faith.  Saint Francis, 9 Cal.5th at 729.

In this case, the Complaint does not support application of equitable tolling.  There are no allegations that address the first element of equitable tolling.  Nothing in the Complaint suggests that any Defendant received notice of any kind that Plaintiffs intended to file a suit against them by October 8, 2018.  Because the Complaint does not plausibly allege the first element of equitable tolling, equitable tolling will not prevent dismissal.

(2)   Equitable Estoppel

When a California statute of limitations is borrowed, federal courts also borrow California's equitable estoppel doctrine.  Lukovsky, 535 F.3d at 1051-52.[10]  Equitable estoppel may be appropriate where the defendant's act or omission actually and reasonably induced the

---

[10] The Ninth Circuit has not consistently cited to or relied on California's equitable estoppel law in § 1983 cases.  See Hidalgo v. Engle, 2021 U.S. Dist. LEXIS 183571, *9 n.1 (C.D. Cal. Aug. 30, 2021) (citing various Ninth Circuit cases).  Nevertheless, the general rule is that federal courts borrow state law equitable doctrines in relation to borrowed state law statutes of limitation.  See Emrich, 846 F.2d at 1199.  Further, Lukovsky found that California's equitable estoppel law is consistent with federal common law.  In the absence of clearer instruction from the Ninth Circuit, the Court will read Lukovsky as endorsing the view that federal courts borrow California's equitable estoppel law when they also borrow a California statute of limitations for a federal claim.

1  plaintiff to refrain from filing a timely suit.  Doe v. Marten, 49 Cal.App.5th 1022, 1028 (2020).

2  The act or omission must be one that constitutes a misrepresentation or non-disclosure of material

3  fact, rather than law.  Millview Cnty. Water Dist. v. State Water Resources Control Bd., 32

4  Cal.App.5th 585, 599 (2019).  Generally, a plaintiff must show four elements to apply the doctrine

5  of equitable estoppel:  "(1) the party to be estopped must be apprised of the facts; (2) he must

6  intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had

7  a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts;

8  and (4) he must rely upon the conduct to his injury."  J.M. v. Huntington Beach Union High Sch.

9  Dist., 2 Cal.5th 648, 656 (2017); Honeywell v. Workers' Comp. Appeals Bd., 35 Cal.4th 24, 37

10 (2005); see Lukovsky, 535 F.3d at 1051-52; see also Estate of Amaro v. City of Oakland, 653 F.3d

11 808, 813 (9th Cir. 2011).  When a governmental entity is the party to be estopped, there must also

12 be a showing that affirmative acts or affirmative misrepresentations by the governmental entity

13 were involved and application of estoppel must not effectively nullify a strong rule of policy that

14 has been adopted for the benefit of the public.  See J.M., 2 Cal.5th at 657 (discussing affirmative

15 acts or misrepresentations); Lentz v. McMahon, 49 Cal.3d 393, 399-400 (1989) (discussing public

16 policy concerns); see also Estate of Amaro, 653 F.3d at 813.  The rule of equitable estoppel

17 includes the requirement that the plaintiff exercise reasonable diligence.  Bernson v. Broning-

18 Ferris Industries, 7 Cal.4th 926, 936 (1994).  A plaintiff must plead with particularity the facts that

19 give rise to equitable estoppel/fraudulent concealment.  Guerrero v. Gates, 442 F.3d 697, 707 (9th

20 Cir. 2006).

21                                              (a)      The City

22         The parties' dispute essentially boils down to the issues of misconduct and sufficient

23 diligence.

24         As for misconduct, Plaintiffs rely on two press releases[11] and the failure of the City to

25

26 [11] The opposition and the Complaint explain that the District Attorney issued a statement approximately 21 months
    after the shooting.  However, because the statement was issued by the District Attorney, a public official who is
    separate and apart from the City and its officers, it is unclear how the press release can be imputed to any Defendant in
27 this case.  Equitable estoppel applies against a defendant when that defendant engages in improper conduct.  See
    Lukovsky, 535 F.3d at 1051-52; J.M., 2 Cal.5th at 656.  Plaintiffs cite no authority that would permit the actions of a
28 seemingly independent third party to be attributed to other Defendants.  Without such authority, the Court will not
    consider the press release by the District Attorney for purposes of misconduct.

disclose the findings of the Shooting Review Board report, key facts, and the bodycam videos, to argue that there was misconduct by the City. With respect to the City's general failure to disclose, there are insufficient allegations and insufficient arguments to suggest that the City engaged in any misconduct. Missing from Plaintiffs' arguments are any indication that Plaintiffs requested any of the materials or information that were not disclosed, or that the City somehow had an affirmative obligation to release the identified materials or information to either the public at large or to Plaintiffs in particular. Plaintiffs cite no authority that indicates misconduct is present from mere "silence" in the absence of some obligation to "speak." In the absence of an obligation on the City or request by Plaintiffs (which could support a stonewalling argument), the mere non-disclosure of the identified materials or information is not sufficient misconduct for purposes of equitable estoppel.

With respect to the City's October 10 press release, the press release indicates that the officers confronted Jackson as she rapidly approached them with knives and that the officers used a combination of lethal and non-lethal force, which ultimately lead to Jackson's death. The press release suggests that the shooting was reasonable and justified. However, the press release omitted the fact that Jackson was shot with a breaching round in the back, that the officer who fired the breaching round was out of position and did not intend to fire a breaching round, that no "game plan" was discussed, and that Jackson was shot in the back with the breaching round and a pistol round after she had dropped the knives and was staggering away from the officers. It is not reasonable to argue that each of these omissions are things that would naturally appear in a press release. Nevertheless, these omitted facts paint a very different picture of the confrontation with Jackson and the officers. Particularly troubling is the press release's statement that "bean bags" were deployed. The statement is inaccurate in that, according to the Complaint, at best only one bean bag was deployed. Completely omitted from the press release is the fact that a breaching round was used against Jackson, a round that apparently caused severe injury to Jackson. The press release identified three of the four types of force used against Jackson. It was the omitted breaching round which would have raised significant questions to a reasonable person because the breaching round is not intended to be used against people, it is used to aid in making entries into

buildings and locked doors.  Identification of the breaching round would have been consistent with the structure of the press release, and it would have raised questions regarding why that force was used, particularly since two non-lethal or less lethal force options that are intended to be used against people are identified.  Construing the allegations in the light most favorable to the Plaintiffs, see Kwan, 854 F.3d at 1096, at this time the Court is satisfied that the press release constitutes affirmative misconduct because:  (1) it suggests that all force used against Jackson was reasonable and justified, despite the bodycam video which allegedly indicates that that not all of the force used was reasonable; (2) it misrepresented that multiple bean bag rounds were deployed; and (3) it failed to disclose that a breaching round was deployed while listing every other force medium that was deployed.

As for diligence, there are no allegations that Plaintiffs undertook any kind of investigation or made any requests on the City until November 2020, well after the applicable limitation periods expired.  This suggests the absence of any diligence.  Plaintiffs rely on the October 10 press release and *inter alia* an unpublished Ninth Circuit case, *Gomez v. City of Torrance*, 311 F. App'x 967 (9th Cir. 2009).

In *Gomez*, the Ninth Circuit reversed the District Court's decision on summary judgment that equitable estoppel did not apply.  See id. at 969.  In relevant part, the Ninth Circuit explained:

> Here, plaintiffs alleged facts and offered evidence that, if proved, would have led reasonable persons to believe that they did not have a claim for relief until they viewed the surveillance video of the shooting.  See Gibson v. United States, 781 F.2d 1334, 1344-45 (9th Cir. 1986). Plaintiffs presented evidence that the police and the district attorney's office provided them with a false and misleading investigative report, which concluded that officers acted lawfully when they shot Gomez. They submitted affidavits stating that they relied on the investigative report in deciding not to file suit. Additionally, plaintiffs introduced evidence that police withheld a surveillance video of the shooting until after the expiration of the limitations period; this video contradicted the investigative report in several important respects.

Id.

In this case, the Complaint indicates that Plaintiffs knew that Jackson had significant and lengthy mental health and substance abuse problems that resulted in multiple police encounters over the years, including § 5150 welfare detentions.  Moreover, Glenn believed that Jackson was drunk and suicidal in the early morning hours of October 8 and reported these facts to Bettis,

Callahan, and Lamantia.  Glenn had called the police in the first instance because Jackson was vandalizing his home, which could be considered violent conduct (at least towards property, if not also towards the property owner).  Further, as discussed above, the press release suggests that the force used was justified.  The press release indicated that the officers confronted Jackson in front of or at her parents' home and that Jackson moved rapidly towards the officers with knives raised above her head, which is clearly dangerous and aggressive conduct and consistent with suicidal behavior.[12]  Also, by identifying two non-lethal/less-lethal force options, it is reasonable to assume that the officers attempted to detain Jackson by first using less-lethal force followed by lethal force.  However, as discussed above, the press release contains a key omission concerning the breaching round and paints a different picture of the entire confrontation than that of the bodycam videos.

Admittedly, this is a close question.  Plaintiffs' opposition does nothing to dispel the notion that they did nothing in terms of an investigation between October 2016 and November 2020.  Plaintiffs cite no cases in which no investigation or inquiry of any kind had been performed by the plaintiff.  However, the issue of whether a plaintiff has exercised reasonable diligence is generally a question of fact.  Cleveland v. Internet Specialties West, Inc., 171 Cal.App.4th 24, 31 (2009); April Enterprises, Inc. v. KTTV, 147 Cal.App.3d 805, 833 (1983); see also Pesnell, 543 F.3d at 1042 (application of equitable estoppel is factually intensive inquiry that is generally not suitable for resolution under Rule 12(b)(6)); Jolly v. Eli Lilly & Co., 44 Cal.3d 1103, 1112 (1988) (application of statute of limitations is generally a question of fact).  Given the October 10 press release and the information known to Plaintiffs before and at the time of the shooting, for purposes of this Rule 12(b)(6) motion, the Court cannot say that this case is so distinguishable from *Gomez* that equitable estoppel cannot apply.  There is nothing per se unreasonable about relying on the public press releases of a municipality.  Therefore, the Court concludes that the allegations concerning Jackson's known history and behavior combined with the October 10 press release are sufficient to suggest that equitable estoppel could apply to the RA and ADA vicarious liability

---

[12] "Suicide by cop" is a recognized and regrettable phenomenon.  See Lal v. California, 746 F.3d 1112, 1117-20 (9th Cir. 2014); George, 736 F.3d at 844 (Trott, J., dissenting).

1  claims against the City.  Dismissal of the RA and ADA vicarious liability claims against the City

2  based on the expiration of the statute of limitations is inappropriate.

3  (b)      Individual Officers

4          By virtue of the bodycam footage and the presence of the individual officers at the

5  shooting, the Court can accept that all Defendants knew the true state of events at the shooting.

6  Further, the Court will also accept that Plaintiffs did not know of the absence of any game plan for

7  detaining Jackson, that the force used against Jackson was at a time when she was staggering away

8  from the officers and not a danger to anyone, and that a breaching round was erroneously used

9  against Jackson.  However, there is a problem with misconduct and reliance.

10         The Court has found for purposes of this Rule 12(b)(6) motion that the City's October

11  10 press release is misleading and contains a key omission; thus, it constitutes sufficient

12  misconduct for purposes of equitable estoppel.  The Complaint identifies no comparable conduct

13  by Bettis, Callahan, and Lamantia.  The Complaint indicates that Bettis, Callahan, and Lamantia

14  used force against Jackson and then were interviewed by MPD personnel.  No other clear conduct

15  by these officers is alleged.  Further, in the absence of an express allegation to the contrary, the

16  Court will not infer that ordinary patrol officers[13] determined whether to issue the October 10

17  press release or determined the content of the October 10 press release.  The press release is

18  something that appears to be an organizational decision that was made by and is attributable to the

19  MPD and thus, the City.[14]  Equitable estoppel examines misconduct by a particular defendant that

20  justifies tolling the statute of limitations as to that defendant.  The three officers' silence after the

21  shooting is not sufficient misconduct.  In the absence of factual allegations that show misconduct

22  apart from simply remaining silent, or allegations or relevant case authority that would impute the

23  October 10 press release to the officers, the allegations do not demonstrate sufficient misconduct

---

24  [13] The Court in no way is using the term "ordinary patrol officers" in a derogatory sense.  Patrol officers perform

25  invaluable services to their communities.  The Court uses the term to attempt to convey that the three officers do not
   appear to be high enough within a typical law enforcement hierarchy to determine when or if a press release is issued

26  or what the content of the press release may be.

27  [14] The Complaint's allegations suggest that Chief Carroll played a role in the press release.  However, the Court has
   determined that dismissing the federal claims against Chief Carroll is inappropriate at this time because an accurate

28  accrual date cannot be determined.  The Court expresses no opinions at this time regarding Chief Carroll and equitable
   estoppel.

by the three officers or reasonable reliance on that misconduct by the Plaintiffs.  Therefore, the Complaint does not adequately allege equitable estoppel as to Bettis, Callahan, and Lamantia, and dismissal of these three Defendants based on the expiration of the statute of limitations is appropriate.

2.      Pleading Sufficiency[15]

Defendants argue that the federal claims against chief Carroll are not plausible because there is an insufficient link between Chief Carroll and the use of force against Jackson.

As explained above, a supervisor may be liable:  (1) for his own culpable action or inaction in the training, supervision, or control of his subordinates; (2) for his acquiescence in the constitutional deprivations of which the complaint is made; or (3) for conduct that showed a reckless or callous indifference to the rights of others."  Keates, 883 F.3d at 1243; Lemire, 726 F.3d at 1074.

Here, the Complaint plausibly alleges acquiescence.  A Shooting Review Board was convened in April 2017, and Chief Carroll was part of that board.  The Complaint also alleges that the officers' bodycams were on and that the shooting of Jackson was recorded.  There is no allegation that the Shooting Review Board examined the bodycam videos, but it is reasonably inferred that the videos were reviewed by the board.  The unanimous conclusion of the Shooting Review Board was that the shooting was within policy, despite the fact that a breaching round was used against Jackson as her back was turned and she was staggering away from the officers and not posing a threat.  Considering the evidence that would have been available to and considered by the Shooting Review Board, Chief Carroll's membership on that board and apparent agreement that the shooting was "within policy" is sufficient for purposes of this Rule 12(b)(6) motion to plausibly allege acquiescence.

---

[15] In their reply, Defendants argue for the first time that the Monell allegations, as opposed to the supervisory allegations, are too conclusory and inappropriately rely on prior instances of alleged excessive force.  Raising these new issues for the first time in the reply is improper as it gives Plaintiffs no opportunity to respond.  Therefore, the Court will not consider Defendants' arguments relating to the sufficiency of the Estate's Monell claims.  See Mitchell v. United States, 971 F.3d 1081, 1084 n.4 (9th Cir. 2020); Zamani v. Carnes, 491 F.3d 990, 997 (9th Cir. 2007); Defazio v. Hollister, 636 F.Supp.2d 1045, 1071 (E.D. Cal. 2009); Association of Irritated Residents v. C&R Vanderham Dairy, 435 F.Supp.2d 1079, 1089 (E.D. Cal. 2006).

1    Additionally, the Court agrees with Plaintiffs that the Complaint adequately alleges

2    inadequate supervision.  The Complaint indicates that no training, policies, or particular

3    supervision were provided for contacts with those impaired due to substances or mental health

4    conditions.  Further, the Complaint identifies numerous instances of alleged excessive force that

5    occurred during Chief Carroll's tenure as police chief as further support for the assertion that

6    Chief Carroll does not adequately supervise his officers' use of force.[16]

7    In sum, the Court does not find that the allegations are too conclusory to plausibly state a

8    claim.  Therefore, dismissal of the supervisory claims against Chief Carroll is inappropriate.

9                              b.    RA and ADA Claims

10    A "disability" is a "physical or mental impairment that substantially limits one or more

11    major life activities of [the] individual [who claims the disability,] or "a record of such an

12    impairment," or "being regarded as having such an impairment."  42 U.S.C. § 12102(1); Weaving

13    v. City of Hillsboro, 763 F.3d 1106, 1111 (9th Cir. 2014).  The term "major life activities" is non-

14    exclusively defined to include "caring for oneself, performing manual tasks, seeing, hearing,

15    eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading,

16    concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A); Weaving, 763

17    F.3d at 1111.  These definitions are to be construed in favor of broad coverage.  42 U.S.C. §

18    12102(4); Weaving, 763 F.3d at 1111.  Determining whether an impairment is substantially

19    limiting requires an individualized assessment in comparison to most people in the general

20    population.  Weaving, 763 F.3d at 1111.

21    The City contends that the Complaint does not adequately allege that Jackson had a

22    disability.  The Complaint alleges that Jackson struggled with mental health and substance abuse

23    issues over the course of several years and that she had an extensive record of law enforcement

24    _____

25    [16] In terms of Chief Carroll's liability, the Court does not find that instances of excessive force that either pre-date or post-date Chief Carroll's tenure are relevant.  Further, not all of the instances of alleged excessive force are relevant to

26    the claims against either the City or Chief Carroll.  For example, the Melgoza case identified in the Complaint ended with a jury verdict that found no Constitutional violations, no battery, and no outrageous conduct, but did find plaintiff to be 80% negligent and the defendant officer to be 20% negligent; $1 was awarded in total damages.  See Doc. Nos.

27    70 & 71 in Melgoza v. City of Modesto, 1:11-cv-0066 AWI BAM.  Melgoza simply does not aid Plaintiffs.  That being said, the Court will not assess each case identified in the Complaint.  In the context of this Rule 12(b)(6) motion, it is

28    enough to note that Plaintiffs are supporting part of their supervisory liability and Monell liability claims on prior instances of alleged excessive force, but not all of the cases identified are relevant.

1  contacts with MPD that included three § 5150 welfare detentions.  See Complaint ¶¶ 17, 18.  The

2  Complaint also alleges that Jackson was known to MPD to be a disabled woman and that

3  Jackson's mental health and substance abuse problems substantially limited her ability to care for

4  herself, concentrate, think, and communicate.  See id. at ¶¶ 17, 18.

5       The above allegations are sufficient to demonstrate that Jackson had a significant history of

6  mental health and substance abuse problems and that she had multiple interactions with MPD

7  officers over a period of years.  The Complaint also adequately identifies major life activities that

8  were affected by Jackson's mental health and substance abuse problems.  However, the Complaint

9  does not adequately describe what Jackson's mental health problems were, nor does the Complaint

10 adequately allege how her mental health conditions limited any of the identified major life

11 activities.  Without allegations that clarify Jackson's mental health conditions and explain how

12 those conditions affected the identified major life activities, no plausible ADA or RA claim is

13 stated because the allegations do not plausibly suggest that an identified impairment substantially

14 limited a major life activity.  See Coates v. Washoe Cnty. Sch. Dist., 2020 U.S. Dist. LEXIS

15 229102, *15-*16 (D. Nev. Dec. 4, 2020); Laface v. E. Suffolk Boces, 2020 U.S. Dist. LEXIS

16 85343, *27-*28 (E.D. N.Y. May 14, 2020); Brooks v. Agate Res., Inc., 2019 U.S. Dist. LEXIS

17 83681, *17-*18 (D. Or. Mar. 25, 2019); Zambrano v. Rite Aid Corp., 2018 U.S. Dist. LEXIS

18 223154, *12-*13 (C.D. Cal. Dec. 21, 2018); McKenna v. Permanente Med. Grp., Inc., 894

19 F.Supp.2d 1258, 1278 (E.D. Cal. 2012).  Therefore, dismissal of the ADA and RA causes of

20 action is appropriate.  See id.

21

22 **II.**      **State Law Claims – Sixth, Seventh, Eighth, Ninth, & Tenth Causes of Action**

23       *Defendants' Arguments*

24       Defendants argue that all state law claims are barred by the failure to timely comply with

25 the requirements of the California Government Claims Act.  A plaintiff is required to submit a

26 written claim to a government entity within six months of the time his cause of action accrues and

27 must file suit within six months of the entity's denial of his written claim.  The Complaint shows

28 that all state law claims accrued on October 8, 2016, which is the date Plaintiffs knew or should

have known of Jackson's injuries when she was shot and killed.  Plaintiffs did not file a written

claim until January 21, 2021, well beyond the applicable six month period.

Defendants also argue that the Complaint alleges a single claim for assault and battery

even though assault and battery are two distinct torts.  Because there is a failure to make distinct

allegations that support an assault claim that is separate from a battery claim, the Complaint

should be viewed as alleging merely battery.

Finally, Defendants argue that the claims against Chief Carroll are barred by Cal. Gov.

Code § 820.8.

### *Plaintiffs' Opposition*

Plaintiffs argue that the belated discovery rule applies in this case.  Although Jackson was

shot and killed on October 8, 2016, Plaintiffs did not discover the circumstances giving rise to the

claims until November 2020, when they obtained access to the Shooting Review Board (and the

access was obtained through the public docket of another case against the City).  The failure to

discover facts sooner was justified because the Defendants actively and intentionally concealed the

bodycam videos and other critical details and stated that the shooting was lawful and justified.

With a November 2020 accrual, the January 21, 2021 government claim was timely.  Alternatively,

for the reasons that equitable estoppel applies to the § 1983 claims, equitable estoppel also applies

to the state law claims.

With respect to Chief Carroll, Plaintiffs argue that § 820.8 immunity does not apply

because the Complaint is attempting to hold him liable for his own conduct as a supervisor, and

not vicariously liable for the actions of Bettis, Callahan, and Lamantia.

### *Discussion*

### 1.    Assault

Plaintiffs do not address Defendants' argument that the battery/assault cause of action

should be read as alleging only a battery claim.  The torts of "assault" and "battery" conceptually

distinct causes of action.  Brown v. Ransweiler, 171 Cal.App.4th 516, 523 n.6 (2009).  The

allegations under the cause of action appear to be more readily susceptible to a battery cause of

action because a harmful, offensive, or unwanted touching of Jackson's person is clearly

implicated.  See Conte v. Girard Orthopaedic Surgeons Medical Grp., Inc., 107 Cal.App.4th 1260, 1266 (2003) (discussing the nature of a civil battery claim).  In the absence of any kind of defense of an assault claim, the Court will dismiss any claim for assault under the seventh cause of action and limit that cause of action to a tortious battery claim.  Cf. Culinary Studios, Inc. v. Newsom, 517 F.Supp.3d 1042, 1066 (E.D. Cal. 2021) (finding that a plaintiff's failure to defend a claim in opposition to a motion to dismiss could be viewed as either a concession that no plausible claim was stated or possible abandonment of the claim); Brown, 171 Cal.App.4th at 523 n.6 (viewing a claim for "assault and battery" as one for battery where the plaintiff focused only on the battery cause of action).

### 2.    Government Claims Act Limitations Period

As a prerequisite for filing suit for "money or damages" against a public entity, the California Government Claim Act requires presentation of a claim to the public entity.  See Cal. Gov. Code § 945.4; State of California v. Superior Ct., 32 Cal.4th 1234, 1240-44 (2004) ("Bodde").  Lawsuits that seek monetary relief based on claims sounding in tort, as well as claims sounding in contract, are lawsuits for "money or damages."  See City of Stockton v. Superior Court, 42 Cal.4th 730, 738 (2007); Sparks v. Kern County Bd. of Supervisors, 173 Cal.App.4th 794, 798 (2009); Baines Pickwick, Ltd. v. City of Los Angeles, 72 Cal.App.4th 298, 307 (1999). Claims relating to a cause of action for death or injuries to the person or injuries to personal property must be presented no later than six months after the accrual of the cause of action.  See Cal. Gov. Code § 911.2(a).  The term "injury" means "death, injury to a person, damage to or loss of property, or any other injury that a person may suffer to his person, reputation, character, feelings, or estate, of such nature that it would be actionable if inflicted by a private person." Cal. Gov. Code § 810.8; Holt v. Kelly, 20 Cal.3d 560, 564 n.4 (1978); Ovando v. County of Los Angeles, 159 Cal.App.4th 42, 63 n.7 (2008). Claims relating to "any other cause of action" must be presented no later than one year after the accrual of the cause of action.  See Cal. Gov. Code § 911.2(a).  "Accrual of the cause of action for purposes of the government claims statute is the date of accrual that would pertain under the statute of limitations applicable to a dispute between private litigants."  Shirk v. Vista Unified Sch. Dist., 42 Cal.4th 201, 208-09 (2007); K.J. v.

Arcadia Unified Sch. Dist., 172 Cal.App.4th 1229, 1234 (2009).  The claims presentation requirements also apply to claims against public employees for injuries resulting from his scope of employment as a public employee.  See Cal. Gov. Code 950.2; Williams v. Hovarth, 16 Cal.3d 834, 838 (1976); Olson v. Manhattan Beach Unified Sch. Dist., 17 Cal.App.5th 1052, 1055 n.1 (2017); Massa v. Southern Cal. Rapid Transit Dist., 43 Cal.App.4th 1217, 1222-23 (1996); Fowler v. Howell, 42 Cal.App.4th 1746, 1750-51 (1996).  "Timely claim presentation is not merely a procedural requirement, but is . . . a condition precedent to a plaintiff maintaining an action against [a public entity], and thus [is] an element of the plaintiff's cause of action." Shirk, 42 Cal.4th at 209; see DiCampli-Mintz v. County of Santa Clara, 55 Cal.4th 983, 991 (2012); Bodde, 32 Cal.4th at 1240.  Accordingly, the failure to timely present a claim for money or damages to a public entity bars the plaintiff from bringing suit against that entity or its employee.  City of Stockton, 42 Cal.4th at 738; Bodde, 32 Cal.4th at 1239; Sparks, 173 Cal.App.4th at 798; Fowler, 42 Cal.App.4th at 1753.

Under California law, a cause of action accrues at the time when the cause of action is complete with all of its elements.  Rubenstein v. Doe no. 1, 3 Cal.5th 903, 911 (2017).  Therefore, a cause of action accrues upon the occurrence of the last element of the cause of action.  Aryeh v. Canon Bus. Sols., Inc., 55 Cal.4th 1185, 1191 (2013).  Under California's discovery rule, however, accrual may be postponed and the running of the limitations period tolled until the plaintiff either discovers or has reason to discover, the cause of action.  Quarry v. Doe 1, 53 Cal.4th 945, 960 (2012); Fox v. Ethicon Endo-Surgery, Inc., 35 Cal.4th 797, 807 (2005).  A plaintiff has reason to discover a cause of action when he has reason at least to suspect a factual basis for its elements.  Quarry, 53 Cal.4th at 960; Fox, 35 Cal.4th at 807.  Suspicion of one or more elements of a cause of action, coupled with knowledge of any remaining elements, will generally trigger the statute of limitations period.  Quarry, 53 Cal.4th at 960; Fox, 35 Cal.4th at 807.  The term "elements" is not used in a hyper-technical sense, but refers to the generic elements of wrongdoing, causation, and harm.  Fox, 35 Cal.4th at 807; Nguyen v. Western Digital Corp., 229 Cal.App.4th 1522, 1552 (2014).  Therefore, courts look to whether the plaintiff has reason to at least suspect that a type of wrongdoing has injured him.  Fox, 35 Cal.4th at 807; Nguyen, 229

Cal.App.4th at 1552.  An "injury" in this context means both a person's physical condition and its wrongful or negligent cause.  See Fox, 35 Cal.4th at 808 n.2; Nguyen, 229 Cal.App.4th at 1553. As long as a plaintiff has an adequate suspicion of wrongdoing, he must go find the facts and cannot wait for the facts to find him.  Genisman v. Carley, 29 Cal.App.5th 45, 51 (2018). However, if a person only reasonably suspects one type of wrongdoing, the statute of limitations will not begin to run on a wholly different cause of action based on a different type of wrongdoing, the facts of which the person may not yet be aware.  See Fox, 35 Cal.4th at 814-15; Rosas v. BASF Corp., 236 Cal.App.4th 1378, 1394 (2015).  Issues surrounding the statute of limitations, including accrual and reasonable discovery, are normally questions of fact.  See Fox, 35 Cal.4th 810; Rosas, 236 Cal.App.4th at 1394; Nguyen, 229 Cal.App.4th at 1552.

### a.    Accrual

### (1)    Survival Claims

Four of the five state law claims are brought by the Estate (excessive force under the California constitution, § 52.1, assault/battery, and negligence).  Plaintiffs attempt to argue an accrual date for the survival claims based on their own knowledge and suspicions.  Plaintiffs cite no authority in support of their implied premise that accrual in a survival case is measured by what the estate's representative knew or suspected, as opposed to what the decedent knew or suspected. However, as survival actions, these claims existed before Jackson died, survived her death, and are brought by the Estate on her behalf.  See Brenner, 12 Cal.App.5th at 605 & n.9; Dominguez, 118 Cal.App.3d at 243; Adams, 196 Cal.App.4th at 78; Quiroz, 140 Cal.App.4th at 1264; see also Ruiz, 50 Cal.4th at 850 n.3.  In the absence of contrary authority cited by Plaintiffs, the Court will examine what Jackson (not Plaintiffs) would have known or suspected for purposes of accrual of the survival claims.

In this case, Jackson would have been aware of the conduct of the officers as well as the physical injuries she suffered by the officers' use of force, including Bettis's use of a breaching round, on October 8, 2016.  That is, Jackson would have known or at least suspected a number of wrongful acts by the officers caused her an injury on October 8.  Therefore, the Court concludes that the state law survival claims alleged against Bettis, Callahan, and Lamantia, as well as the

vicarious liability theory against the City for these three officers' conduct, accrued on October 8, 2016.

With respect to Chief Carroll, the state law claims alleged against him are essentially based on his supervision of MPD police officers.  As with the federal claims alleged against him, the Court cannot determine in the context of this Rule 12(b)(6) motion when Jackson had at least a suspicion that she was harmed by the alleged inadequate supervision and training of MPD officers. Jackson clearly suffered physical injuries at the hands of individual officers and would have clearly known or at least suspected that wrongdoing in the form negligence or "excessive force" by those officers injured her.  However, the parties do not adequately address what Jackson would have known or suspected about Chief Carroll's own culpable conduct in causing her injuries. Therefore, the Court cannot determine an accrual date at this time for the state law claims against Chief Carroll or the vicarious liability theories against the City for Chief Carroll's conduct.

(2)   Tenth Cause of Action- Wrongful Death

California's wrongful death statute (Cal. Code Civ. P. § 377.60) "creates a new cause of action in favor of the heirs as beneficiaries, based upon their own independent pecuniary injury suffered by loss of a relative, and distinct from any the deceased might have maintained had he survived." Ruiz, 50 Cal.4th at 844; Horwich v. Superior Ct., 21 Cal.4th 272, 283 (1999).  "[A] wrongful death action has its own statute of limitations, which runs from the date of death rather than any antecedent injury." Horwich v. Superior Ct., 21 Cal.4th 272, 283 (1999); see also Scroggs v. Coast Cmty. Coll. Dist., 193 Cal.App.3d 1399, 1403 (1987) ("The longstanding rule is that a wrongful death action is a separate and distinct right belonging to the heirs, and it does not arise until the death of the decedent.").  In this case, Jackson died on October 8, 2016.  Therefore, the statute of limitations began to run on October 8, 2016.  Horwich, 21 Cal.4th at 283.

b.   Equitable Estoppel[17]

The parties make no arguments that are substantively different with respect to equitable estoppel for the federal and state claims.  Indeed, the same standard for equitable estoppel applies

---

[17] The Court notes that Plaintiffs did not raise the issue of equitable tolling with respect to the state law claims. Recent California authority holds that the doctrine of equitable tolling cannot be invoked to suspend § 911.2's six-month deadline for filing a government claim.  Willis v. City of Carlsbad, 48 Cal.App.5th 1104, 1121 (2020).

1  to both the state and § 1983 claims.  Therefore, the Court's analysis is the same.  With respect to

2  Bettis, Lamantia, and Callahan, there is a failure to sufficiently allege misconduct and reliance.

3  With respect to the City, there is sufficient misconduct alleged through the October 10, 2016 press

4  release, and the press release combined with the Plaintiffs' knowledge of Jackson's mental health

5  history and existing condition at the time of the shooting present factual questions that the Court

6  cannot resolve in the context of Rule 12(b)(6).  Therefore, dismissal of the claims against Bettis,

7  Callahan, and Lamantia based on the expiration of the statute of limitations is appropriate, but

8  dismissal of the claims against the Chief Carroll and the vicarious liability claims against the City

9  is inappropriate.

10           3.      Vicarious Liability Immunity

11          Chief Carroll contends that he is entitled to immunity under Cal. Gov't Code § 820.8.  That

12  section provides in relevant part that, except as may otherwise be provided by statute, "a public

13  employee is not liable for an injury caused by the act or omission of another person."  Cal. Gov't

14  Code § 820.8.  Section 820.8, however, does not shield a public employee from his own allegedly

15  wrongful acts.  Id. ("Nothing in this section exonerates a public employee from liability for injury

16  proximately caused by his own negligent or wrongful act.");  Weaver v. State of California, 63

17  Cal.App.4th 188, 202 (1998).  Section 820.8 has been held to be inapplicable to claims against a

18  supervisor for his own improper or negligent supervision and training.  E.g. Rodriguez v. County

19  of L.A., 891 F.3d 776, 799 (9th Cir. 2018); Figueroa v. Kern Cty., 2021 U.S. Dist. LEXIS 41068,

20  *22-*23 (E.D. Cal. Mar. 3, 2021) (and cases cited therein).

21          Here, the Court does not read any of the state law claims as attempting to allege vicarious

22  liability against Chief Carroll.  The Complaint expressly alleges when it relies on vicarious

23  liability, and those instances involve holding the City vicariously liable for the acts of its police

24  officers.  The Court reads the Complaint as alleging state law claims against Chief Carroll based

25  on his own actions in supervising and training his officers.  Therefore, § 820.8 has no application

26  to this case, and dismissal due to application of § 820.8 is inappropriate.  See Rodriguez, 891 F.3d

27  at 799; Figueroa v. Kern Cty., 2021 U.S. Dist. LEXIS 41068 at *22-*23.

28

1

### III.   AMENDMENT & ADDITIONAL ISSUES

2   The Court is dismissing all claims against Bettis, Callahan, and Lamantia due to the

3   expiration of the statute of limitations.  Leave to amend is the general rule.  See Ebner, 838 F.3d at

4   962.  Because the Court cannot determine whether amendment would necessarily be futile, the

5   Court will dismiss the claims against these Defendants with leave amend.  Any amendments must

6   address the statute of limitations related problems identified in this order.  Further, as part of the

7   amendment process, if Plaintiffs can allege additional facts to support their own diligence, they

8   should do so.

9   The Court is also dismissing the RA and ADA claims against the City as implausibly pled.

10   Because it is not clear that amendment would futile, dismissal will be with leave to amend.

11   The Court is also dismissing the assault cause of action because Plaintiffs did not defend

12   the claim.  Since Plaintiffs did not defend the claim, any amended complaint should not include an

13   assault cause of action and should be limited to alleging battery only.

14   Additionally, the Complaint names both the City and MPD as separate defendants.  The

15   MPD is an agency or sub-unit of the City.  The Court is aware of no utility or purpose in naming

16   both the City and the MPD as separate defendants in this case.  Therefore, the Court will dismiss

17   the MPD as an unnecessary and redundant party.  Any amended complaint shall simply name the

18   City as a defendant.[18]  Further, Plaintiffs should reconsider their reliance on the numerous

19   instances of alleged excessive force and prune any case that does not actually support Monell or

20   supervisory liability, such as the Melgoza case.

21   Apart from whether leave to amend is granted or denied, the Court has two concerns that

22   have been raised through the briefing process, but not actually addressed in the briefs.  First, the

23   briefing has raised the possibility that a number of the claims at issue may have accrued in

24   November 2020.  A survival claim involves a claim that existed and accrued before death.  See

25   George, 736 F.3d at 833 n.6; Tatum, 441 F.3d at 1093 n.2; Smith, 818 F.2d at 1416; Runyan,

26

---

27   [18] If Plaintiffs have a legitimate and legally relevant basis for naming both the City and its sub-unit the MPD as separate defendants in this action, then Plaintiffs may file a motion for reconsideration.  The motion must be supported by citation to relevant authority and explain why Plaintiffs wish to pursue claims against both the City and the MPD.  Otherwise, the Court remains of the position that naming a municipality and its sub-unit/agency as separate defendants in the same case is an unnecessary redundancy that leads to unnecessary inefficiencies and complications.

28

1  54Cal.4th at 861-62; see also Cal. Code Civ. Proc. §§ 366.1, 377.20.  If Plaintiffs' position is

2  correct that November 2020 is the proper accrual date for many of the claims, then those claims

3  accrued about four years after Jackson's death.  Those claims would not have belonged to Jackson,

4  and her Estate could not pursue them.  See id.  In the amendment process, Plaintiffs need to be

5  cognizant of when a claim truly accrued, and whether the claim can be properly pursued by the

6  Estate.

7        Second, the Complaint acknowledges that Jackson was drunk, may have been suicidal, and

8  approached the officers with multi-colored knives in her hands.  Importantly, the Complaint

9  alleges that after Lamantia fired his first pistol shot and Callahan discharged his taser, Jackson

10 dropped the knives, turned, and began to stagger away; it was at that point that Jackson was

11 allegedly no longer a threat to the officers or anyone else.  See Complaint at ¶¶ 41-49.  There are

12 no allegations regarding whether officers gave orders for Jackson to stop or whether Lamantia

13 gave a warning when one was feasible that he would use his pistol if Jackson did not stop.

14 Nevertheless, the allegations suggest that Jackson was a real threat to the officers at least as of the

15 time that Callahan discharged his taser and Lamantia fired his first round.  Cf. Booke v. County of

16 Fresno, 98 F.Supp.3d 1103, 1117 (E.D. Cal. 2015) (discussing considerations applicable to a use

17 of force).  A taser is considered a less-lethal force option that temporarily immobilizes a suspect.

18 See Bryan v. MacPherson, 630 F.3d 805, 825-26 (9th Cir. 2010) (describing tasers); Sanders v.

19 City of Fresno, 551 F.Supp.2d 1149, 1168 (E.D. Cal. 2008) (same).  Its use would seem to fit a

20 situation such as the one confronting Callahan.  If the Estate wishes to pursue excessive force

21 claims based on Lamantia's first pistol shot and/or Callahan's use of a taser, then additional

22 factual allegations that demonstrate the unreasonableness of those two uses of force should be

23 included in any amended complaint.[19]

24 //

25 //

26 //

27

28 [19] The Court may raise pleading inadequacies sua sponte.  See Wong v. Bell, 642 F.2d 359, 361 (9th Cir. 1981).

**ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1.  Defendant Lamantia's motion to dismiss (Doc. No. 16) is GRANTED and all claims alleged against him are DISMISSED with leave to amend, except for the assault claim which is dismissed without leave to amend;

2.  Defendants the City of Modesto, Bettis, Callahan, and Carroll's motion to dismiss (Doc. No. 9) is GRANTED in part as follows:

    a.  All claims alleged against Defendants Bettis and Callahan are DISMISSED with leave to amend, except for the assault claim which is dismissed without leave to amend;

    b.  The Estate's Rehabilitation Act and Americans with Disabilities Act causes of action are DISMISSED with leave to amend;

    c.  The assault claim is DISMISSED without leave to amend;

3.  Defendant Modesto Police Department is DISMISSED as an unnecessary and redundant party;

4.  Defendants the City of Modesto, Bettis, Callahan, and Carroll's motion to dismiss is otherwise DENIED;

5.  Plaintiffs may file an amended complaint consistent with the analysis of this order within twenty-eight (28) days of service of this order;

6.  If Plaintiffs fail to file a timely amended complaint, then leave to amend will be withdrawn without further notice, Defendants Bettis, Callahan, and Lamantia will be terminated from this case, and the remaining Defendants shall file an answer within forty-two (42) days of service of this order.

IT IS SO ORDERED.

Dated:   October 14, 2021                                        _____

                                                                SENIOR DISTRICT JUDGE